OPINION
{¶ 1} Defendant-appellant James R. Thaler, Jr., appeals from his conviction and sentence, following a jury trial, for Felonious Assault. He contends that his conviction is not supported by sufficient evidence, and is against the manifest weight of the evidence, because a reasonable factfinder could not find, from this evidence, that the weapon he used in his assault upon the victim was a deadly weapon. He also argues that the trial court erred in sentencing him, by relying upon a portion of Ohio's sentencing statute that has been held unconstitutional under State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-356. He finally argues that the trial court erroneously advised him that he would be subject to a post-release control period of five years, when the correct post-release control period in this case is three years.
 {¶ 2} We conclude that there is evidence in this record from which a reasonable finder of fact could conclude that Thaler used the pool cue stick with which he hit his victim as a deadly weapon. The evidence supports a conclusion that Thaler hit his victim with a swinging blow to the neck with great force, which both broke the pool cue stick that the victim was holding upright, and also caused the victim to lose consciousness for a period of from thirty seconds to a couple of minutes.
 {¶ 3} As to the assigned sentencing errors, the State confesses error, and we agree.
 {¶ 4} Accordingly, Thaler's conviction is Affirmed, but his sentence is Reversed, and this cause is Remanded for re-sentencing.
 I {¶ 5} Thaler went with Kellie Nuteson to the Sure Shots bar to shoot some pool. They had been at another bar shooting pool, but that bar was not well attended, they had only each other to play pool with, and Thaler wanted to shoot some pool with others.
 {¶ 6} James Ebbing and his girlfriend, Sarah Wiemers, were already at the Sure Shots bar, shooting pool. They both had participated in a pool tournament at the bar, which was owned by Ebbing's parents, but had both been eliminated from the tournament earlier. The tournament was ongoing, but there was at least one pool table not being used in the tournament, which was open for play.
 {¶ 7} Thaler and Ebbing had never met before. Thaler put his quarters on the pool table, thereby getting in line to play pool. After each game was complete, the winner would keep the table, and the next challenger in line would pay the one dollar in quarters necessary to free up the balls. The challenger would then rack the balls, and play would begin.
 {¶ 8} It was not long before Thaler was the next person in line to "challenge the table." Ebbing had been the winner of the previous game. Before Thaler racked the balls for play, there had been minimal, if any conversation between Thaler and Ebbing. There had been no animosity displayed between the two, who had not previously met. Both had had a few beers; neither appeared to be intoxicated.
 {¶ 9} As Thaler racked the balls, he told Ebbing, "I'll play you for your old lady," indicating Wiemers. Wiemers took offense, indicating that Thaler should leave her out of it, and that this was no way to talk. Ebbing told Thaler, "Not my call, but I don't think she'll have you." Although Ebbing testified that he was angry, or at least displeased, because of Thaler's "old lady" remark, nothing more was said, and the game proceeded. Ebbing acknowledged that as the game proceeded, and as it appeared that he had the upper hand, he acted "cocky," and made one or more statements that he was going to win, but there is no evidence that any harsh words or threats were uttered by either man.
 {¶ 10} At a certain point, Ebbing missed his shot, or failed to sink a ball, and the play passed to Thaler. Ebbing told Thaler, "show me what you got," and went over to stand at the bar. John Faust, a friend of Ebbing's, went over to him and said, "she don't look like no old lady to me," and began laughing. That was the last thing that Ebbing remembered before being struck. He had no recollection of being struck. There had been no harsh words or threats uttered before this.
 {¶ 11} Wiemers witnessed the assault. She testified that:
 {¶ 12} "[Thaler] was looking at the table for shots and kind of stalled for a minute. And he was actually bent over at the corner of the table, like he was positioning himself to take a shot.
 {¶ 13} "And all of a sudden just stood up, grabbed the shaft of the cue stick, and took a baseball bat swing to Jimmy."
 {¶ 14} Later, Wiemers testified:
 {¶ 15} "Q. Okay. Now, you indicated that this individual [Thaler] turned around and took a baseball bat swing with the pool cue and hit Jimmy in the neck.
 {¶ 16} "A. Correct.
 {¶ 17} "Q. What did Jimmy do at that point?
 {¶ 18} "A. He stumbled back about a step or two and fell back, he was unconscious.
 {¶ 19} "Q. How long was he unconscious?
 {¶ 20} "A. Very short time frame, 30 seconds, a minute.
 {¶ 21} "Q. Okay.
 {¶ 22} "A. It took him a couple of minutes for him to get up, though.
 {¶ 23} * * *
 {¶ 24} "Q. After Jimmy was struck and he fell down, there was some questioning about how long it took him to get back up. Did he bounce right back up ready to fight this guy?
 {¶ 25} "A. No.
 {¶ 26} "Q. In fact, did he even move when he fell down?
 {¶ 27} "A. No. He actually was able to talk before he was able to move his legs and arms.
 {¶ 28} "Q. And was he able to even talk immediately upon falling down?
 {¶ 29} "A. No.
 {¶ 30} "Q. So he fell down for awhile, couldn't talk or move, and then eventually after being — regaining the ability to speak, he still couldn't move at that point?
 {¶ 31} "A. (Nodding head.)
 {¶ 32} "Q. I know you don't know, but could you give us a ballpark in terms of time frame, ma'am?
 {¶ 33} "A. Maybe a couple minutes."
 {¶ 34} Shane Taylor, another witness, described the assault as follows:
 {¶ 35} "Q. Prior to this individual striking Jimmy, had you seen anything out of the ordinary at that table?
 {¶ 36} "A. Nothing at all.
 {¶ 37} "Q. Was anybody attacking this individual?
 {¶ 38} "A. I did not see nothing.
 {¶ 39} "Q. You didn't see any kind of —
 {¶ 40} "A. Any activity or anything of — only except the striking of the pool cue against the guy's side of his head.
 {¶ 41} * * *
 {¶ 42} "Q. Okay. Now, what happened to Jimmy after you saw this individual strike him with the stick?
 {¶ 43} "A. He dropped to the floor real fast. It wasn't — it was like he was — it was like he was dead when I looked at him."
 {¶ 44} Police responded to the scene promptly. Ebbing declined medical treatment, and, in fact, declined to yield the table, but proceeded to shoot some more pool for a while. Police took pictures of his neck at the bar, and these are in evidence. The next day, he sought medical attention, and was diagnosed as having sustained soft tissue injury. He testified that his neck was sore for some time afterwards, but that he otherwise sustained no long-term injury.
 {¶ 45} Immediately after the assault, Thaler fled the scene, but when police officer Scott Geisel, who had responded at the scene, became aware that Thaler had called Nuteson on her cell phone, and was talking to her, Geisel ordered Nuteson to give him the phone, talked to Thaler, and was later able to track Thaler down and apprehend Thaler.
 {¶ 46} Thaler was charged with two counts of Felonious Assault. The first count charged Thaler with knowingly causing or attempting to cause physical harm to Ebbing by means of a deadly weapon, to wit: the pool cue stick. The second count charged Thaler with knowingly causing serious physical harm to Ebbing. At Thaler's request, the jury was instructed on the lesser offense of Assault. At the conclusion of the trial, the jury returned a verdict convicting Thaler of the first count — knowingly causing or attempting to cause physical harm by means of a deadly weapon — but acquitting him of the second count.
 {¶ 47} Thaler was sentenced to four years of imprisonment, and was advised that he would be subject to five years of post-release control. From his conviction and sentence, Thaler appeals.
 II {¶ 48} Thaler's First and Second assignments of error are as follows:
 {¶ 49} "THE COURT ERRED IN OVERRULING DEFENDANT'S RULE 29 MOTION FOR ACQUITTAL ON COUNT ONE BECAUSE THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE THAT THALER'S POOL CUE WAS A `THING CAPABLE OF INFLICTING DEATH' AND IT THEREFORE COULD NOT BE FOUND A DEADLY WEAPON.
 {¶ 50} "THALER'S CONVICTION ON COUNT ONE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE SINCE THE STATE FAILED TO PRESENT EVIDENCE THAT THALER'S POOL CUE WAS A `THING CAPABLE OF INFLICTING DEATH' AND IT THEREFORE SHOULD NOT HAVE BEEN FOUND A DEADLY WEAPON."
 {¶ 51} Thaler and the State argue both of these assignments of error together, and they both turn upon the issue of whether the finder of fact, based upon the evidence in this record, could reasonably have found that the pool cue stick he used to assault Ebbing was a thing capable of inflicting death. The statute under which Thaler was charged, R.C. 2903.11(A)(2), requires as an element that the physical harm caused or attempted be by means of a deadly weapon. "Deadly weapon" is defined in R.C. 2923.11(A) as "an instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."
 {¶ 52} There can be no doubt, and Thaler does not dispute, that the pool stick cue involved in the assault was used as a weapon. The issue is whether a reasonable finder of fact could find, beyond reasonable doubt, from the evidence in this record, that the pool stick cue was capable of inflicting death.
 {¶ 53} It is true, as Thaler points out, that the State presented no testimony, lay or expert, that the pool stick cue used in the assault was capable of inflicting death. But we conclude that the testimony in the record would support a reasonable inference that the pool stick cue, as wielded by Thaler in a swinging blow to Ebbing's neck, was capable of inflicting death. The jury could reasonably have found that the blow was struck with great force, since it broke the cue stick that Ebbing was holding upright, and since the blow rendered Ebbing unconscious for a period of at least thirty seconds. In our view, a reasonable jury could find that a blow delivered with such force, using a cue stick, aimed at the side of the victim's neck, which would necessarily include the victim's head within the area imperiled by the blow (since the forcefulness of the swinging blow would diminish the precision with which the target area could be defined), would be capable of inflicting death.
 {¶ 54} Thaler cites State v. Brown (1995),101 Ohio App.3d 784. In that case, the defendant shot a girl in the buttocks with a BB gun. There was no evidence offered in that case that as designed the BB gun was capable of inflicting death, and the circumstances under which the BB gun was actually used in that case, shooting someone in the buttocks, were not sufficient to prove, beyond reasonable doubt, that as used, the BB gun was capable of inflicting death. We agree with the State that Brown
is distinguishable, based upon the target area of the body. In fact, had Thaler hit Ebbing in the buttocks with the cue stick, we would agree that Brown is on all fours. But the areas of Ebbing's body exposed to the peril represented by Thaler's swinging blow — Ebbing's neck and head — are obviously far more vulnerable to life-threatening injury than the buttocks.
 {¶ 55} Thaler also cites cites In re Idom, Cuyahoga App. No. 79639, 2002 Ohio 3632. The victim in that case testified that he was beaten by several males with a paddle "on his shoulders, back and legs." The paddle was described as "the old paddle that the school teachers used to have." In our view, this is a much closer case than State v. Brown, supra. Nevertheless, we conclude that it is distinguishable. The paddle, as described, would have a shorter swinging radius, which would make its impact confinable within narrower limits than the swinging pool stick blow delivered by Thaler. The area upon which those blows were delivered did not include the neck, but only went up as far as the victim's shoulders. These small differences are, in our view, crucial. We agree that a reasonable finder of fact could not have found, in In re Idom, that the paddle, as used, was capable of inflicting death, but we conclude that a reasonable finder of fact could find, in the case before us, that the cue stick, as used, was capable of inflicting death.
 {¶ 56} We conclude that Thaler's conviction is not against the manifest weight of the evidence and that it is supported by sufficient evidence. Thaler's First and Second assignments of error are overruled.
 III {¶ 57} Thaler's Third Assignment of Error is as follows:
 {¶ 58} "THE COURT ERRED IN SENTENCING MR. THALER IN ACCORDANCE WITH AN UNCONSTITUTIONAL STATUTE."
 {¶ 59} In sentencing Thaler to four years of imprisonment, the trial court applied R.C. 2929.14(B), and made a finding required by the statute for imposing more than the minimum prison term. That part of the statute has been held unconstitutional inState v. Foster, 109 Ohio St.3d 1, 2006-Ohio-356. The State confesses error in this regard, and we agree.
 {¶ 60} Thaler's Third Assignment of Error is sustained. Pursuant to ¶ 104 of Foster, supra, Thaler's sentence is Reversed, and this cause will be remanded for re-sentencing.
 IV {¶ 61} Thaler's Fourth Assignment of Error is as follows:
 {¶ 62} "THE COURT ERRED IN MAKING MANDATORY NOTIFICATIONS REGARDING POST-RELEASE CONTROL AT MR. THALER'S SENTENCING."
 {¶ 63} Pursuant to R.C. 2929.19(B)(3), a trial court, in sentencing a defendant to a term of incarceration, is required to notify the defendant of the post-release controls to which he will be subject. The trial court advised Thaler that he would be subject to a post-release control period of five years. Thaler contends that the trial court erred, because, pursuant to R.C.2967.28(B)(2), the proper period of post-release control for this offense is three years, not five years.
 {¶ 64} The State confesses error in this regard, and we agree. Thaler's Fourth Assignment of Error is sustained.
 V {¶ 65} Thaler's First and Second assignments of error having been overruled, and his Third and Fourth assignments of error having been sustained, the sentence imposed by the trial court is Reversed, the judgment of the trial court is Affirmed in all other respects, and this cause is Remanded for re-sentencing in accordance with this opinion.
Wolff and Donovan, JJ., concur.